UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CORRIE ROBBINS, individually,<br><br>Plaintiff,<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS, LLC, a Delaware Limited Liability Company; and COMCAST CABLE COMMUNICATIONS MANAGEMNET, LLC, a Delaware Limited Liability Company, d/b/a COMCAST CORPORATION,<br><br>Defendants. | CASE NO. 3:19-cv-05603-RBL<br><br>ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION<br><br>DKT. # 8 |

## INTRODUCTION

THIS MATTER is before the Court on Defendant Comcast Corporation's Motion to Compel Arbitration. Dkt. # 8. The underlying case involves allegations of sexual harassment and retaliation at the workplace. Comcast argue that Plaintiff Corrie Robbins should be compelled to arbitrate this dispute consistent with the company's alternative dispute resolution program. In opposition, Robbins claims that she never agreed to be bound by an arbitration agreement.

For the following reasons, DENIES Comcast's Motion.

## BACKGROUND

Robbins began working at Comcast in 1999. She alleges that in 2017 she began experiencing sexual harassment at work. After some time, she managed to get transferred to a different team and then started working from home. However, Comcast later discharged Robbins on August 21, 2018. She filed the current lawsuit asserting discrimination-related claims on June 12, 2019, in state court. Defendants removed the case to federal court on July 1. They then filed the current Motion to Compel Arbitration, claiming that Robbins opted to participate in Comcast's alternative dispute resolution (ADR) program known as "Comcast Solutions."

Comcast Solutions was rolled out in 2013 and entails three steps for resolving disputes. The first step is an informal "review/facilitation" process and the second step is mediation. Dkt. # 9, Ex. B, at 4-6. If both of these fail, the employee may request that the parties proceed to step three, which is binding arbitration. *Id*. at 6. Under the program, the parties mutually select an arbitrator from a professional dispute resolution organization. *Id*. The parties are allowed some limited discovery and may obtain their own legal representation. *Id*. at 6-7. Comcast pays for the arbitration hearing and reimburses the employee for up to $1,500 of their legal fees, regardless of the outcome. *Id*. at 7. However, all results are kept confidential. *Id*. The program covers all "claims that involve an allegation that the employee personally has been harmed or damaged by an unlawful action taken by the Company or its representatives related to the employment relationship." Dkt. # 9, Ex. C, at 3.

Comcast took several steps to inform existing employees of its new ADR program. First, Comcast mailed a cover letter and brochure to all employees at their address of record on September 27, 2013. Dkt. # 9 at 2. The cover letter informed employees that Comcast Solutions was an "additional resource" offering a "faster, less expensive, and impartial option for

addressing concerns of a legal nature affecting your employment." Dkt. # 9, Ex. D. In bold, the letter states, "Your Action Required: . . . If you prefer not to participate in the program, all you need to do is complete an "Opt Out" form . . . and return it no later than November 8, 2013." *Id*. The brochure is a seven-page document that broadly describes the Comcast Solution's 3-step approach. Dkt. # 9, Ex. A. However, it only mentions that the program involves waiving access to the judicial system in regular-sized text on the last few pages. *Id*. at 5-6.

Second, Comcast sent out a mass email to employees on October 16, 2013, with the subject line "Comcast Solutions." Dkt. # 9 at 3. The email began by stating, "Information regarding a new program called Comcast Solutions was recently mailed to your home address" and provided a link to a website with the program brochure. Dkt. # 9, Ex. F. The email went on to tell employees that "[t]he consideration period for participation in the Comcast Solutions Program ends on Friday, November 8, 2013. . . . [I]f you do not wish to participate in the program, you will need to complete and return an 'opt out' form . . . by no later than November 8, 2013, if you have not already done so." *Id*.

Third, every year Comcast has employees acknowledge the company's Code of Conduct and Employee Handbook. Dkt. # 21 at 2. The acknowledgements form for 2017 and 2018 specifically state the following:

> Unless I am not participating in Comcast Solutions because I (i) previously "opted out" of the program during the program roll out period, or (ii) am covered by a collective bargaining agreement or an authorized employment agreement which does not include participation in Comcast Solutions, I understand that the Comcast Solutions Program is a mutually-binding contract between me and Comcast and that my continued employment with Comcast is confirmation that I am bound by the terms of the Comcast Solutions Program. Further information about the Comcast Solutions Program -- including the Program Guide, Frequently Asked Questions, and various Program forms (including the Initial Filing form) -- is available for me to review on ComcastNow.

Dkt. # 21, Ex. A, at 5, 7. The acknowledgements also state, "I understand that if I click 'I do not acknowledge' and disclose an exception below, I . . . am still bound by the Comcast Solutions policy." *Id*. at 6, 8.

Comcast presents evidence that it mailed the September 27 cover letter and brochure to Robbins at her address of record, which was 1214 179th St. Ct. E, Spanaway, WA. Dkt. # 9, Ex. E. The letter was not returned as undeliverable. Dkt. # 9 at 3. Comcast also shows that the October 16 email was sent to Robbins at her work email address and was opened. *Id*. Comcast's email system allows the company to require a recipient to verify that they read a particular email, and Robbins provided such verification for the Comcast Solutions email. Dkt. # 9, Ex. G. There is also evidence that Robbins acknowledged Comcast's Code of Conduct and Employee Handbook for the years 2014, 2015, 2017, and 2018. Dkt. # 21, Ex. A. Comcast has no record of Robbins opting out of its ADR program. Dkt. # 9 at 3.

Robbins, however, disputes that she received and viewed the Comcast Solutions letter and email. In her sworn declaration, Robbins states that she owned the 1214 179th St. property in 2013 but had moved to a different address a few minutes away in 2004. Dkt. # 19 at 3. Comcast's records show that Robbins did not update her employee information to reflect this new home address until 2017. Dkt. # 21 at 2. Robbins also states that she never opened any email regarding Comcast Solutions. Dkt. # 19 at 2. She explains that she received over 100 emails per day while working for Comcast and claims that, although she may have technically opened the email by scrolling through subject lines on her screen, she did not read its contents or open any attachments. *Id*. In short, Robbins maintains that she "never knew of any arbitration agreement or alternative dispute resolution program at all during [her] employment at Comcast." *Id*.

## DISCUSSION

**1. Legal Standard**

The Federal Arbitration Act provides for the enforceability of valid arbitration agreements and "permits a party 'aggrieved by the alleged ... refusal of another to arbitrate' to

petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting 9 U.S.C. § 4). A court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id.* (citation omitted). If the answer to both questions is 'yes,' then the agreement must be enforced. *Id.* The FAA "leaves no place for the exercise of discretion by a district court;" instead it mandates "that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in original).

However, a court may "submit to arbitration only those disputes . . . that the parties have agreed to submit." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (internal quotations omitted). "To interpret the parties' contract, a court should look to general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1018 (9th Cir. 2016) (internal quotations omitted). However, "[i]f the parties contest the existence of an arbitration agreement, the presumption in favor of arbitrability does not apply." *Id.* Such formation issues are decided by a district court, not an arbitrator. *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007).

**2.      Existence of a Valid Arbitration Agreement**

The parties do not appear to dispute that the FAA applies or that Robbins's claims are within the scope of the Comcast Solutions program.[1] Therefore, the Court's task is to decide

---

[1] In any case, the Court concludes that Robbins' claims would be within the scope of the arbitration provision if a valid agreement was formed.

whether an arbitration agreement was formed and whether it is enforceable. Comcast argues that Robbins effectively agreed to the company's ADR program when she failed to opt out of it in 2013 after being given five weeks to do so. Comcast contends that it informed Robbins about the program and her ability to opt out via US mail and email. Comcast also asserts that its ADR program is neither procedurally nor substantively unconscionable. Robbins responds by arguing that she never received notice of the Comcast Solutions program and that a contract could not have been formed for lack of consideration. Robbins also contends that that any agreement would be unconscionable and thus unenforceable.

The party seeking to compel arbitration must prove the existence of an agreement by a preponderance of the evidence. *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *see also Weiss v. Lonnquist*, 153 Wash. App. 502, 511 (2009). If there is a genuine issue of material fact regarding the formation of a contract, the court may schedule an evidentiary hearing or order limited discovery. *Kwan v. Clearwire Corp.*, No. C09-1392JLR, 2012 WL 32380, at *10 (W.D. Wash. Jan. 3, 2012) (citing 9 U.S.C. § 4); *Keijiro Sakaeda v. Kotobuki-Ya, Inc.*, No. CV1201995GAFJCX, 2012 WL 12896522, at *4 (C.D. Cal. May 3, 2012). However, a court need not order additional discovery if it would be unlikely to yield new evidence. *See Voll v. HCL Techs. Ltd.*, No. 18-CV-04943-LHK, 2019 WL 144863, at *5 (N.D. Cal. Jan. 9, 2019).

a. Consideration

Under Washington law, "[i]ndependent, additional, consideration is required for the valid formation of a modification or subsequent agreement" once an employee has already been hired. *Labriola v. Pollard Grp., Inc.*, 152 Wash. 2d 828, 834 (2004). "Independent consideration involves new promises or obligations previously not required of the parties." *Id*. However, the Ninth Circuit has held that consideration for an arbitration agreement proposed subsequent to

hiring may be found in the employer's own promise to be bound by the arbitration process. *See Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002). At least one court applying Washington law has reached the same conclusion. *See Allbaugh v. Perma-Bound*, No. C08-5713-JCC, 2009 WL 10676437, at *7 (W.D. Wash. Aug. 14, 2009).

Here, although Comcast started its ADR program years after Robbins was hired, the program involved reciprocal promises that were sufficient consideration for a contract. Indeed, Comcast Solutions involves a fairly generous promise by Comcast to pay up to $1,500 of an employee's legal fees, win or lose, if they choose to initiate arbitration. Although Robbins cites to Washington cases holding that an employer may not unilaterally modify a contract to add a non-compete provision, arbitration agreements are different. Whereas non-compete provisions only impose obligations on the employee, arbitration agreements require both parties to abide by the arbitrator's decision. Although many employees may not want to submit to arbitration, that does not mean arbitration agreements don't involve reciprocal promises.

b. *Objective Manifestations of Assent*

The remaining question is therefore whether Robbins's failure to opt out of Comcast's ARD program amounted to binding assent under these circumstances. A contract is formed by mutual assent to the essential terms, which "generally takes the form of an offer and an acceptance." *Weiss*, 153 Wash. App. at 511. The offeror is the "master of the offer" and may propose acceptance through conduct. *Discover Bank v. Ray*, 139 Wash. App. 723, 727 (2007). Washington courts regard silence as assent to a contract only in situations where there is a "duty to speak." *Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wash. App. 846, 853 (2001). The Ninth Circuit has found that such a duty exists when an employer provides employees with a new arbitration agreement and gives them adequate time to opt out. *See Najd*,

294 F.3d at 1109 (applying California law). Furthermore, where a party has expressed assent to a contract, failure to read its terms does not negate formation. *See Tjart v. Smith Barney, Inc.*, 107 Wash. App. 885, 896 (2001); *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 799 (2003).

When an offer is extended online, courts have often measured mutual assent in terms of the offeree's actual or constructive notice of the contract's terms. *See, e.g., Kwan v. Clearwire Corp.*, No. C09-1392JLR, 2012 WL 32380, at *7-11 (W.D. Wash. Jan. 3, 2012). As one court has explained, "the central issue of concern in Washington in determining whether or not a consumer is bound by an alleged contract is whether the consumer has notice of and access to the terms and conditions of the contract prior to the conduct which allegedly indicates his or her assent." *Id*. at 9; *see also Miebach v. Colasurdo*, 102 Wash. 2d 170, 176 (1984) ("[K]nowledge of facts sufficient to excite inquiry is constructive notice of all that the inquiry would have disclosed."); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Ct. App. 1972) ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious."). This frame of analysis is typically applied to so-called "clickwrap" and "browsewrap," terms referring to the types of agreements that consumers encounter online while browsing a website or clicking through screens. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-77 (9th Cir. 2014). Nonetheless, the idea is grounded in the traditional requirements of contract law. *See id*. at 1175.

Several courts have found that evidence that an employee received and opened an email is sufficient to show the employee was on notice of its contents. *See Sturtevant v. Xerox Commercial Sols., LLC*, No. C16-1158RSM, 2016 WL 4992468, at *2, 5 (W.D. Wash. Sept. 19, 2016); *Voll v. HCL Techs. Ltd.*, No. 18-CV-04943-LHK, 2019 WL 144863, at *5 (N.D. Cal. Jan.

9, 2019). Similarly, "[t]he mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time." *Olson v. The Bon, Inc.*, 144 Wash. App. 627, 634 (2008). However, the presumption only arises with proper proof of mailing, such as independent proof of postmark or a dated receipt. *Id*. The presumption is also not conclusive; "[t]he sole purpose of a presumption is to establish which party has the burden of going forward with evidence on an issue." *Neuson v. Macy's Dep't Stores Inc.*, 160 Wash. App. 786, 794 (2011).

Here, determining whether Robbins is bound to Comcast's ADR program first requires assessing the evidence that Robbins received the September 27 letter and the October 16 email. Comcast's evidence that it mailed the letter to Robbins, which includes a photocopy of the envelope addressed to Robbins, is sufficient to create a presumption that Robbins received the letter. *See* Dkt. # 9, Ex. E. However, Robbins's assertion under oath that she had previously moved to a different address and never received the letter is sufficient to rebut that presumption. *See Gibson v. Rouse*, 81 Wash. 102, 109 (1914) (prima facie evidence that a letter was mailed holds "little weight against positive testimony that the letter was not received"). Besides arguing that it was Robbins's responsibility to update her employee file with her new address, Comcast presents no additional evidence showing that Robbins actually received the letter, such as a return receipt or a signed acknowledgement. In the absence of such proof, Comcast has not met its burden of showing that Robbins more likely than not received the letter containing materials on Comcast Solutions.[2]

---

[2] If Comcast uncovers additional evidence on this issue through Discovery, it may opt to renew its Motion to Compel Arbitration. *See Neuson v. Macy's Dep't Stores Inc.*, 160 Wash. App. 786, 796 (2011); *Keijiro Sakaeda v. Kotobuki-Ya, Inc.*, No. CV1201995GAFJCX, 2012 WL 12896522, at *4 (C.D. Cal. May 3, 2012).

1    The same is not true for the October 16 email. Comcast's email system allowed it to
2    require Robbins to confirm that she had read a particular message, which she did for the 2013
3    email. Even if an employee sets their confirmation settings to automatic, an email cannot be
4    confirmed as read unless the user opens it. This casts great doubt on Robbins's assertion that she
5    never opened the email. Indeed, in her declaration Robbins equivocates about whether she
6    "technically opened" the email. Dkt. # 19 at 2. In light of this, Comcast has met its burden of
7    proving that Robbins received and read the October 16 email.

8    Nonetheless, this email alone is insufficient to form an arbitration agreement because it
9    contains no language that would put a reasonable employee on notice that an offer to contract
10   was on the table. Instead, the short message is littered with cryptic references to a "new
11   program" that employees may want to "participate in." Dkt. # 9, Ex. F. The most informative
12   text in the email states that "the Comcast Solutions Program offers [Comcast] employees a
13   faster, less expensive and impartial option for addressing many employment-related legal
14   claims." *Id*. at 3. But even this frames the program as merely one "option" for resolving claims,
15   not a binding agreement that waives the right to bring civil suits. The email's several references
16   to the November 8, 2013, "opt out" date are also insufficient to transform the email into a valid
17   offer. *Id*. Merely telling an employee that they may opt out of "participation" in a program does
18   not inform them that failing to do so will *bind* them to a set of contractual terms.

19   Finally, although clicking the hyperlink to the Comcast Solutions brochure may tip
20   employees off regarding the contractual nature of the program, this is unhelpful when the email
21   itself does not inform employees that this is the case.[3] Consequently, Robbins did not form a

---

[3] Even if an employee did happen to click the link, the brochure also does not make the contractual nature of Comcast Solutions obvious at first glance and only mentions waiving the right to judicial action on the last few pages. *See* Dkt. # 9, Ex. A, at 5-6.

contract by viewing the October 16 email and failing to opt out. Because Comcast has not submitted sufficient evidence to show that Robbins received the September 27 letter, the Court does not address whether those materials would be sufficient to form a contract.

This leaves only the acknowledgement form that Robbins apparently reviewed in 2017 and 2018. Unlike the email, the acknowledgement form contains the following unmistakably contractual language: "I understand that the Comcast Solutions Program is a mutually-binding contract between me and Comcast and that my continued employment with Comcast is confirmation that I am bound by the terms of the Comcast Solutions Program." Dkt. # 21, Ex. A, at 5, 7. Although this statement still does not inform employees that Comcast Solutions involves a binding arbitration agreement, the next sentence explains where more information can be found. By acknowledging that she reviewed this form and then continuing to work for Comcast, Robbins agreed to be bound by the Comcast Solutions Program on January 1, 2017.

### 3. Unconscionability

In Washington, a contract may be unenforceable if it is found to be either procedurally or substantively unconscionable. *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1259 (9th Cir. 2005). A contract is procedurally unconscionable if the plaintiff "lacked a meaningful choice." *Romney v. Franciscan Med. Grp.*, 186 Wash. App. 728, 740 (2015). "Factors to be considered include the manner in which the contract was created, whether both parties had a reasonable opportunity to understand the terms of the agreement, and whether important terms were buried in a lot of fine print." *Mayne v. Monaco Enterprises, Inc.*, 191 Wash. App. 113, 119 (2015). "At minimum, an employee who asserts an arbitration agreement is procedurally unconscionable must show some evidence that the employer refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her with a reasonable

opportunity to consider its terms, and/or that the terms of the agreement were set forth in such a way that an average person could not understand them." *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wash. 2d 293, 306-07 (2004).

In the employment context, Washington courts have found arbitration provisions procedurally unconscionable when they are buried within a larger document that the employee did not get a fair chance to review before their signature was required. *See, e.g., Steven Burnett v. Pagliacci Pizza, Inc.*, 442 P.3d 1267, 1273 (Wash. Ct. App. 2019). Procedural unconscionability also exists if an arbitration clause is offered as a condition of continued employment that the employee has no option of turning down. *Mayne*, 191 Wash. App. at 121. On the other hand, an arbitration provision is not unconscionable simply because it is included within a larger document. *See id*. at 119; *see also Tjart v. Smith Barney, Inc.*, 107 Wash. App. 885, 899 (2001) (arbitration provision that was "obvious within a fairly short document" was not unconscionable).

Here, the process by which Robbins became bound by the Comcast Solutions Program was procedurally unconscionable. For the same reasons that the October 16 email was not a valid offer, it also did not provide Robbins with a meaningful choice about agreeing to Comcast's arbitration agreement. Indeed, the email appears purposely designed to give only the faintest hints that Comcast's new program involved a binding arbitration agreement. Where an offeror hides not only a contract's terms but also its very existence in such a manner, any resulting agreement must be unconscionable.

While the acknowledgement forms that Robbins reviewed in 2017 and 2018 at least announced that Comcast Solutions involves a binding contract, the "take it or leave it" nature of these offers deprived Robbins of any meaningful choice. The forms make clear that, even if an

employee does not submit their acknowledgement, they are still bound by the Comcast Solutions Program if they continue working at the company if they did not originally opt out. Dkt. # 21, Ex. A, at 6, 8. In essence, there is no way for an employee to avoid entering the arbitration agreement besides quitting. Such a contract is unconscionable and unenforceable.

## CONCLUSION

For the reasons explained above, Comcast's Motion to Compel Arbitration is DENIED. If discovery gives rise to additional evidence that Robbins did receive the October 16 letter containing materials on the Comcast Solutions Program, Comcast may renew their Motion.

IT IS SO ORDERED.

Dated this 30th day of August, 2019.

Ronald B. Leighton
United States District Judge